**F. M. WILLIAMS, Appellant,**

v.

**George D. PATTERSON, District Director of Internal Revenue, Appellee.**

**No. 18371.**

United States Court of Appeals
Fifth Circuit.

Jan. 12, 1961.

Erle Pettus, Jr., Al G. Rives, Birmingham, Ala., for appellant; Rives, Peterson, Pettus & Conway, Birmingham, Ala., of counsel.

James P. Turner, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., William L. Longshore, U. S. Atty., Birmingham, Ala., Meyer Rothwacks, Arthur I. Gould, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The controversy between the taxpayer and the District Director of Internal Revenue is over the disallowance of a railroad conductor's income tax deduction of expenditures for lodging, meals, and tips as "traveling .expenses" during six-hour layovers "away from home" on regular trips, each trip requiring an absence from his home terminal of about sixteen hours. Similar controversies have been the subject of decisions by the Tax Court but, as far as we know, the instant case is one of first impression in the federal courts.

F. M. Williams is a railroad conductor with more than forty years of service with the Atlanta and West Point Railroad and the Western Railway of Alabama. Every other day "Captain" Williams gets up shortly after five in the morning, leaves his house in Montgomery, Alabama, in time to arrive at the railroad station about 6:45 a. m., attends to duties at the station, leaves Montgomery on the Crescent at 7:40 a. m., arrives in Atlanta, Georgia, at 12:15 p. m.,

takes six hours off, returns to duty in time to leave Atlanta at 6:15 p. m. on the Piedmont, pulls in to Montgomery at 10:15 p. m., leaves the Piedmont, and finally reaches home about midnight. It is a long, hard day. The railroad has never ordered Williams to rent a room in Atlanta, nor has it required him to sleep during the layover period. For years, however, because he felt he needed sleep and rest in Atlanta before his return run, Williams rented a reasonably priced room in the Gordon Hotel, a small hotel near the railroad station. At the hotel he had lunch and dinner, rested and slept, bathed and freshened up before boarding the Piedmont. He has had the same room for the last eight years. His superiors know and approve of his taking a room in Atlanta, and know that he may always be reached in Atlanta at the Gordon Hotel; he is subject to call at all times. In 1955 Captain Williams incurred expenses of $796 for meals, lodging, and tips at the Gordon Hotel during his layover in Atlanta. He deducted these expenses from his federal income tax return. The Commissioner disallowed the deductions. After timely payment of the deficiency, Williams filed a claim for refund in the district court for the Northern District of Alabama. The case was tried to a jury. At the conclusion of the trial, the district court, pointing out that there were no disputed facts, denied Williams's motion for a directed verdict and granted the District Director's motion for a directed verdict.[1] We reverse. In the circumstances of this case, the taxpayer's expenditures for the purpose of obtaining sleep and rest, while away from home in his employment as a railroad conductor, were ordinary and necessary traveling expenses under Section 162(a)(2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162(a)(2).

The District Director's motion for a directed verdict is based on Section 162(a)(2) of the 1954 Code, as interpreted in Revenue Ruling 54–497, 1954—2 Cum. Bull. 75. The motion states: Williams was not away from his home overnight; the evidence failed to establish that Williams's trips to Atlanta necessitated his absence from his home terminal for a period substantially longer than an ordinary day's work, or that his duties required him to obtain necessary sleep in Atlanta. Before discussing Revenue Ruling 54–497, we go to the statute.

The Revenue Act of 1918 allowed a general deduction for "ordinary and necessary" business expenses.[2] At first, the Treasury Department construed this provision as denying *any* deduction for meals and lodging.[3] Later, taking a somewhat more liberal view, the Department allowed the deduction, as traveling expenses, of meals and lodging (and tips) "*in excess* of any expenditures ordinarily required for such purposes at home".[4] The 1921 Revenue Act liberalized the policy further in that it provided a specific deduction for "traveling expenses (including the *entire* amount expended for meals and lodging) while away from home in the pursuit of a trade or business".[5] This provision was included in the 1939 Code as Section 23(a)(1)(A), 26 U.S.C.A. § 23(a)(1)(A), and was carried over verbatim in the 1954 Code as Section 162(a)(2), 26 U.S.C.A. § 162:

"(a) In General—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \*

"(2) traveling expenses (including the entire amount expended for

---

1. The trial judge, in directing the jury to find for the defendant, stated that "this is a pilot case or test case . . . if the Court of Appeals says I am wrong about it and these expenses are deductible it won't make me unhappy."

2. Revenue Act of 1918, § 214(a)(1), 40 Stat. 1066.

3. U.S.Treas.Reg. 45, art. 292, 21 Treas. Dec.Int.Rev. 241 (1919).

4. T.D. 3101, 22 Treas.Dec.Int.Rev. 545 (1920).

5. Revenue Act of 1921, § 214(a)(1), 42 Stat. 239.

meals and lodging) while away from home in the pursuit of a trade or business; and * * *."

We note, first, that Congress expressly repudiated a narrow view of the deduction. The Act allows the full amount expended to be deductible, not just the excess of expenditures over the amounts that would ordinarily be spent at home. Moreover, there is no express statutory limitation, even as to reasonableness. Second, we note particularly that there is no language in the statute limiting its application to "expenses incurred while * * * away from home *overnight*".[6] The "overnight" gloss was dreamed up by the Department. Third, there is nothing in the statute indicating any congressional intent that "away from home" means either overnight or away from home for a period substantially longer than an ordinary working day,[7] or that it means "a trip on which the taxpayer's duties [in his released time] required

6. Rev.Rul. 54-497, 1954—2 C.B. 75. Int. Rev.Serv., U.S. Dept. of Treas. Pub.No. 300, 1956—5 CCH par. 6347.

7. The Supreme Court has not yet expressed its opinion as to the meaning of "while away from home". In Commissioner of Internal Revenue v. Flowers, 1946, 326 U.S. 465, 66 S.Ct. 250, 252, 90 L.Ed. 203, the Court made it clear that to be deductible, travel expenses must arise from the exigencies of the employer's business requiring the employee to travel at some place other than his post of duty in advancing the employer's interests. The Court said: "Business trips are to be identified in relation to business demands and the traveler's business headquarters. The exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors." The Supreme Court laid down three requirements for obtaining a travel-expense deduction:

"(1) The expense must be a reasonable and necessary traveling expense, as that term is generally understood. This includes such items as transportation fares and food and lodging expenses incurred while traveling.

"(2) The expense must be incurred 'while away from home.'

"(3) The expense must be incurred in pursuit of business. This means that there must be a direct connection between the expenditure and the carrying on of the trade or business of the taxpayer or of his employer. Moreover, such an expenditure must be necessary or appropriate to the development and pursuit of the business or trade."

See also Peurifoy v. Commissioner, 1958, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30, rehearing denied 358 U.S. 913, 79 S.Ct. 227, 3 L.Ed.2d 234, in which the Court recognized the validity of the rule, that travel expenses are deductible if required by the exigencies of the *employee's* trade or business. In Kenneth Waters, 1949, 12 T.C. 414 the Tax Court exposed the unreality of the "overnight" test: "There is nothing in the legislative history of the travel expense deduction provisions * * * to show that Congress intended any such special interpretation of the words 'travel * * * while away from home * * *' Surely it would be absurd to say that an employee who flies from Boston to Washington on business and returns to Boston on the same day is not entitled to the deduction, but that if he takes two days for the whole trip, he is entitled to the deduction." Similarly, the related requirement that the employee be "away from home substantially longer than an ordinary working day", is also too narrow a concept. In the jet age a man can fly from New Orleans to Washington, transact business for his employer in Washington, and return to New Orleans—all in less time than the ordinary workday. In the instant case, therefore, the primary pertinence of Williams's long day is its effect on his need for sleep and rest. The American Law Institute suggests that the terms "away" and "home" be abandoned: "The Bureau has taken the attitude that a taxpayer is not 'away' unless he stays at least overnight * * * [N]o such requirement is adopted in this draft. Cases concerning the meaning of 'home' tend to make it mean 'principal place of business.' The suggested wording drops the term 'home' and adheres to the essential principle that an expense of travel, in order to be deductible must have been incurred in pursuit of business." ALI Fed.Income Tax Stat. § X 151(B) (5) (Feb. 1954 Draft); ALI, op. cit. supra § X150(c) (May 1952 Tentative Draft). See also Note, Travel Expense Deductions, 43 Va.L.Rev. 59 (1957).

him to obtain necessary sleep away from his home terminal".[8]

We recognize the administrative advantages of a rule of thumb for defining the term, "away from home". We concede it is reasonable to formulate a rule that will enable the Bureau to distinguish between an employee put to the expense of taking a bus or street-car to work and a traveling salesman with a territory to cover.[9] Between these extremes, however, there are innumerable borderline situations, especially in the transportation field, that cannot be measured by the length and breadth of a thumb.

In 1940 the Internal Revenue Service adopted, for railroad trainmen, a rule that seems reasonable and workable:

> "It appears that many locomotive engineers and other railroad trainmen are assigned to runs extending over distances of several hundred miles. On arrival at away-from-home terminals on such runs, they are released from service for sufficient time to secure necessary rest. Thus, they are required to pay for room rental and meals from the time they leave their homes until they return. As they receive no allowances from their employers for such expenses, payment is made out of their personal funds." I.T. 3395, 1940-2 Cum.Bull. 64.

In less clear language the ruling continues:

> "It is held that locomotive engineers and other railroad trainmen; who are required to remain at away-from-home terminals in order to obtain necessary rest prior to making a further run or beginning a return run to the home terminal, are entitled to deduct for Federal income tax purposes the cost of room rental and meals while away from home on such runs."

Under the first quoted paragraph of this ruling, Williams would be entitled to the deduction, since he was "released [at Atlanta] from service for sufficient time to secure necessary rest". The second paragraph, however, leaves hanging in the breeze the question, does the deduction depend on the railroad ordering the employee to sleep and rest during his free time or does it depend on the exigencies of the employment impelling the employee to seek sleep and rest.

In 1954, relying on Osteen v. Commissioner, 1950, 14 T.C. 1261 and Anderson v. Commissioner, 1952, 18 T.C. 649, the Bureau narrowed its construction of the deduction as applied to trainmen. Revenue Ruling 54-497, 1952 Cum.Bull. 75 provides, in part:

> "A taxpayer cannot deduct the cost of his meals and lodging as away-from-home expenses merely because his duties require his physical absence from his principal or regular post of duty during part or all of his actual working hours. In order to deduct such expenses, it is essential that his absence on business from his principal or regular post of duty be of such duration that he cannot leave from and return to that location at the start and finish of, or before and after, each day's work; or at least that he cannot reasonably do so without being released from duty for sufficient time to obtain necessary sleep elsewhere.
>
> "Thus, it is held that a railroad employee assigned to a 'turn around' run, or any other job requiring daily round trips, on which he is able to leave his home terminal and return to it within the same workday (and is not released from duty to obtain necessary sleep elsewhere) cannot deduct the cost of meals consumed on such trips because he is

---

8. The regular post of duty of a member of a train crew is not aboard the train but at the terminal where he begins and ends his regular runs.

9. But in Crowther v. C. I. R., 9 Cir., 1959, 269 F.2d 292, the Court allowed a lumberjack a deduction for transportation expenses in daily commuting to various job sites, as expenses required by the exigencies of the employee's trade. See also Emmert v. United States, D.C.S.D. Ind.1955, 146 F.Supp. 322.

not traveling 'away from home' within the meaning of Section 23(a) (1) (A) of the Code.

"The fundamental rule followed by both the Tax Court and the Internal Revenue Service in all such cases is that a railroad employee can deduct his expenses for meals and lodging only when on a business trip necessitating his absence from his principal or regular post of duty for a minimum period which lasts substantially longer than an ordinary day's work and during which his duties require him to obtain necessary sleep away from such post of duty."

Applying this ruling to the instant case, the District Director contends that the deduction must be disallowed, since: (1) Williams left home and returned the same workday; and, (2) within the meaning of the cases (that is, Osteen and Anderson) Williams's absence from home was not "substantially longer than an ordinary day's work".

We find no mandate in Osteen or in Anderson requiring a change in the rules. And, we find nothing in these cases inconsistent with allowing Williams to deduct his hotel expenses in Atlanta.

In Osteen, 1950, 14 T.C. 1261, a railroad postal clerk, living in Greenville, South Carolina, was assigned to a turnaround run to Charlotte, North Carolina. He was on duty continuously for six hours and twenty minutes (7:55 p. m. to 2:15 a. m.), except for a thirty minute break at Charlotte where he had his third meal of the day. The Tax Court, properly, we think, denied Osteen a deduction for meals at Charlotte.[10] The Court's rationale was:

"The petitioner was in no essentially different position from the worker who is unable to have one of his meals at home. His regular day's work, though it took him away from his home town, was less than seven hours, perhaps shorter than the work day for the ordinary worker. * * * The fact that the meal was eaten at Charlotte offers no material difference."

Williams's position is essentially different from Osteen's, because of the hours Williams was away from home, the duration of his free time in Atlanta, and his greater need for rest and sleep. The nature of his employment put him to expenses not comparable with Osteen's purchase of a third meal during a thirty minute break.

Anderson v. Commissioner, 1952, 18 T.C. 649, supports the taxpayer's position. Anderson was a railway express employee assigned to trains running between Parsons, Kansas, and Oklahoma City, Oklahoma. Anderson's job required him to make two consecutive round trips from Parsons to Oklahoma City and return, lay over at Parsons for forty-five hours, then, resume his duties after the layover for another two consecutive days. Anderson would leave his home terminal at 2:30 a. m. and return at 6:00 p. m. the same day. At Oklahoma City he would be released for two and a half hours to eat and rest. The next day he would leave at 12:00 p. m. and return at 5:00 a. m. On this trip he would be released for three hours. On each trip Anderson ate a meal and slept on a cot in the baggage car during the time he was released from duty. The Tax Court distinguished Osteen on the facts; Osteen's "regular work day was less than seven hours, and. * * * he was on a run which is known as a 'turn around' which did not involve any rest period or overnight run". The Court held, again properly, we think, that Anderson was entitled to deduct the expenses on both runs, not just on the overnight run.

"We think it is too narrow a view of the facts not to regard both round trips as overnight trips. Further-

10. To have allowed Osteen a deduction for his meals would have discriminated against those who do not work in a mobile office. 12 Jour.Tax 312 (1960). The Tax Court has consistently allowed transportation costs on one-day trips, consistently disallowed costs of meals on one-day trips. See Smith, 1960, 33 T.C. No. 97.

more, it was necessary for the petitioner to obtain rest at the end of the outbound run before starting upon the return run. We believe, too, that the determination of the question should not depend upon the length of the rest period. The round trips required 16 and 18 hours during which a rest period was necessary. The facts in this proceeding bring this petitioner within the ruling of the Commissioner, I.T. 3395, supra." 18 T.C. 649, 653.

The Anderson case is not as strong as the instant case, since Anderson was released for only two and a half to three hours, as against Williams's release for six hours, and since the responsibility attached to being a conductor (on whom the safety of others depends) makes more taxing demands than the responsibility attached to a railway express employee. The time Anderson and Williams spent away from home was about the same—sixteen or seventeen hours.

The rationale of Osteen and Anderson is discussed in Herrin v. Commissioner, 28 T.C. 1303 ( .... ), a third case relied on by the District Director. In Herrin, on the authority of Osteen, the Tax Court held that a truck driver could not deduct the costs of three meals on a fourteen hour round trip from Ocala, Florida, to Valdosta, Georgia and return. The driver was not released for rest or sleep at any time. The Court said:

"Technically speaking, petitioner's regular working day includes a portion of 2 days. This factor by itself, however, has not been considered of great enough significance to require different tax treatment for night-time as contrasted with day-time employees. Cf. Fred Marion Osteen, supra. Nor is the proximity in distance to one's home terminal important. Certainly, an employee who travels a 200-mile route will find himself equally as unable to return to his home for meals as an employee who travels a 346-mile route. *The distinguishing factor instead has been whether or not the nature of*

*the employment requires that the employee be released from work to obtain necessary sleep or rest prior to the completion of the journey.* David G. Anderson, 18 T.C. 649."

We agree with this principle, if it means, as we think it does, that the employee is entitled to the deduction if the nature of his employment is such that he is released for sufficient time to obtain sleep and rest and he uses the time for sleep and rest. There are no facts showing that the railroad tied any strings to Anderson's free time. We read Osteen, Anderson, and Herrin, therefore, as not requiring any narrowing of the language of I.T. 3395, 1940-2 Cum.Bull. 64.

Revenue Ruling 54-497 falls short of successfully clarifying the Government's position. In the first paragraph of Revenue Ruling 54-497, quoted above, the language allowing a deduction to railroad employees who cannot reasonably return to their home terminal "without being released from duty for sufficient time to obtain necessary sleep elsewhere" is virtually identical with the corresponding language of the 1940 ruling that trainmen are entitled to the deduction if "on arrival at away-from-home terminals on such runs [of several hundred miles], they are released from service for sufficient time to secure necessary rest". But—the second paragraph of Revenue Ruling 54-497, as quoted above, in explaining the rule, omits the words "for sufficient time". As altered, the ruling possibly may state an acceptable result, but only if it is limited to cases in which the employee is not given any time to rest or sleep. If not so limited, again the Department's position is not clear (1) whether, in order to obtain the deduction, the trainmen must show that the railroad ordered the released time to be spent in sleeping or eating or (2) whether the test is the sufficiency of the released time for the employee to obtain such necessary rest and sleep as the employee would consider proper in the light of his duties. The third paragraph purports to state "the fundamental rule". But

this statement of "the fundamental rule" differs just enough from the first two paragraphs so as to create additional doubt. It may say, or, perhaps, does not say, that in addition to the requirement of absence "substantially longer than an ordinary day's work", the railroad employee must show that the railroad imposed on him, among his other "duties", the duty of obtaining "necessary sleep away from his post of duty".

The District Director's assertion that Williams's absence from Montgomery was not substantially longer than an ordinary work day is an anachronistic notion that astonishes us. Williams, up at five in the morning in order to get to work on time, reported for duty at the Montgomery station at 6:45 a. m.; after the day's work, and if the inbound train was on schedule, he left the Montgomery station to return to his home at about 10:30 or 10:45 p. m. His elapsed time (departure from Montgomery and return) was usually sixteen hours. Often, because his train was late, the elapsed time was seventeen hours. Sometimes it was eighteen hours. The District Director cites no authority for equating 16 to 18 hours with 7 to 8 hours. He ignores the fact that in the Anderson case the employee was also absent about seventeen hours from his home terminal. The circumstance that Williams was on one day and off the next is beside the point. We consider that the Revenue Act does not necessarily require as a prerequisite to a deduction for traveling expenses on less than an overnight trip that the employee work substantially longer than an ordinary workday; but, we take notice of the fact that 16 to 18 hours is not an ordinary workday, and we consider the length of Williams's day as important in its bearing on the question of his need for sleep and rest.

■ The District Director makes much of there being no rule or regula-

tion of the railroad requiring Williams to sleep and rest during his stay in Atlanta; that the taxpayer admitted the railroad did not order him to obtain the hotel room; that, as far as the railroad rules and regulations are concerned, the taxpayer "could go to a picture show or a ball game". No statute or reported case establishes the necessity of any such requirement. If the appellee were correct, the railroad would be placed in the contradictory position of releasing Williams from his duties, yet controlling his free time. There is, therefore, no reason to expect a railroad to adopt a rule regulating an employee's free time and no reason to attach importance to the absence of such a regulation. The particular employee's need for rest and sleep—measured by his age, physical condition, and the length of his day, the importance of his being alert on the return trip—measured by his responsibilities and the nature of his employment; the fear of injury to others—if he should not be alert; and the penalty of losing his employment—should he fall asleep on the job, these and other considerations, supported by the experience of the particular employee and strengthened by the practices and customs of trainmen similarly situated are factors that exercise more control than a railroad regulation. They are the factors to be weighed in determining whether expenditures for rest and sleep are ordinary and necessary traveling expenses. Although most of these factors, in a narrow sense, affect the personal convenience of the traveler, the motivation for sleep and rest arises from the exigencies of the employment, the business demands of the employer, the relation of the employee to his employer.[11] The reality of these exigencies inherent in the employment is not destroyed by the fact that the employee, not the employer, must make the deci-

11. As railroad conductor, in charge of the train, Williams had under his supervision the baggage master, flagman and porter, the firemen and engineer, postal employees, dining car employees, pullman conductor and porters in the pullman.

While the train is moving, in addition to his duties of collecting tickets and fares from passengers, he is required to be on the alert at all times following orders as received and as countermanded. For example, orders to Williams designating

sion to sleep or not to sleep.[12] Williams knew that to hold down his job, he needed sleep and rest. He knew, as well as the railroad, that the safety of others depended on his alertness. We find it impossible to believe that Congress intended the tax law to work against a man holding his job and against the public interest in the safety of railroad operations.

■■ We interpret the Revenue Act, the Tax Court cases, and even the Bureau ruling as permitting the allowance of the deduction in this case. We state the correct rule, as we understand it, as follows:

> If the nature of the taxpayer's employment is such that when away from home, during released time, it is reasonable for him to need and to obtain sleep or rest in order to meet the exigencies of his employment or the business demands of his employment, his expenditures (including incidental expenses, such as tips) for the purpose of obtaining sleep or rest are deductible traveling expenses under Section 162(a) (2) of the 1954 Code.

Reversed and rendered.

his train the superior train with right of way privileges could be changed at any time upon the order designating another train as the superior train. At special points, such as Opelika, Alabama, Williams was enjoined to check with the dispatcher for the clearance of his train.

There is no time while the train is moving that Williams can relax. He must check with other trains at meeting points, and at such points observe all station employees; he must keep a look out for anyone working on track, bridges; he must receive signals from other employees. The run at night from Atlanta to Montgomery is more trying than the daylight run between the same points, because of lack of visibility. At all times, it is the duty of the conductor to stay alert and see that other members of the crew are alert. Any trouble or incident on the train is under the jurisdiction of the conductor. The penalty for sleeping on duty is dismissal from the service.

On arrival at stations, the conductor must supervise the unloading of passengers and baggage. At the end of a run he must file the crew register showing the addresses of the crew; he must

"register in" the train with all requirements, deposit cash, and perform other duties.

The trainmaster in charge of all employees on the West Point route testified that, for thirty years, to his knowledge, it has been the custom for conductors and engineers with layovers in Montgomery or Atlanta to take hotel rooms. The assistant superintendent of the Seaboard Railroad testified that it has been the custom and practice of railroad employees, in the circumstance shown here, to rent a hotel room for sleep and rest in order to freshen themselves and "be assured of being alert" for the return trip.

12. In a footnote to his dissenting opinion in Peurifoy, 1958, 358 U.S. 59, 79 S. Ct. 104, 107, 3 L.Ed.2d 30, Mr. Justice Douglas observed: "The Flowers case does not hold, as the Court suggests, that the deduction is necessarily unavailable if not required by the exigencies of the *employer's* business." (Italics added). See Crowther v. C. I. R., 9 Cir., 1959, 269 F.2d 292 (footnote 9). See also Karno, Traveling Expenses While Away from Home, 33 So.Cal.L.Rev. 307 (1960).